UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ROBERT BOUVIER,                          )
            Plaintiff,                 )
                                       )
      v.                                  )          C.A. No. 11-478-M
                                       )
MICHAEL J. ASTRUE, Commissioner,         )
Social Security Administration,          )
            Defendant.                )

## MEMORANDUM AND ORDER

Robert Bouvier seeks review of a final decision of the Commissioner of the Social Security Administration denying his application for Social Security disability benefits (DIB) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. (the Act). This Court may review a final decision of the Commissioner. 42 U.S.C. § 405(g). This Court GRANTS Mr. Bouvier's Motion to Reverse (ECF No. 8) and DENIES the Commissioner's Motion to Affirm. (ECF No. 10.)

## I.  PROCEDURAL BACKGROUND

Mr. Bouvier filed an application for DIB on March 11, 2009. Tr. at 7. The application was denied initially on July 10, 2009 and again on reconsideration on January 8, 2010. *Id.* Mr. Bouvier requested an administrative hearing, and one was held on May 19, 2011. *Id.* At the hearing, an Administrative Law Judge (ALJ) heard testimony from Mr. Bouvier, represented by counsel, a vocational expert, and a medical expert. *Id.; see also id.* at 25-45. The ALJ also accepted additional written consideration and amended Mr. Bouvier's onset date to November 2, 2008. *Id.* at 7, 196.

On June 8, 2011, the ALJ issued a decision unfavorable to Mr. Bouvier.  *Id.* at 7-16.  The Decision Review Board selected Mr. Bouvier's claim for review, and then his claim was transferred to the Appeals Council.  *Id.* at 4, 22.  The Appeals Council found no reason to review the ALJ's decision; therefore, the ALJ's decision became the final decision of the Commissioner.  *Id.* at 1.

A timely appeal was filed with this Court.  (ECF No. 1.)  Then Mr. Bouvier's case was referred to a magistrate judge.  (ECF No. 5.)  Mr. Bouvier moved to reverse the decision of the Commissioner (ECF No. 8), while the Commissioner moved for an order affirming.  (ECF No. 10.)  The magistrate judge issued a Report and Recommendation (R&R) characterizing this matter as a "close case" but recommending that Mr. Bouvier's motion to reverse the decision be denied and the Commissioner's motion to affirm be granted.  (ECF No. 11 at 18, 21.)

Mr. Bouvier filed a timely objection to the R&R.  (ECF No. 12.)  He asks this Court to reject the R&R.  *Id.*  The Commissioner did not file any response to the R&R or to Mr. Bouvier's objection.

## II.    STANDARD OF REVIEW

This matter is before this Court on Mr. Bouvier's objection to a magistrate judge's R&R.[1]  (ECF No. 12.)  Under 28 U.S.C. § 636(b)(1), this Court must "make a de novo determination of those portions of the [R&R] to which objection is made."  *See also Seavey v. Barnhart*, 276 F.3d 1, 7 (1st Cir. 2001).  This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  Mr. Bouvier makes several objections and contends that this Court should reject the R&R.  (ECF No. 12.)

---

[1]  The parties did not consent to have the case decided by a magistrate judge.  *See* 28 U.S.C. § 636(c).

2

Review of a final decision of the Commissioner is authorized by 42 U.S.C. § 405(g) and § 1383(c)(3). *Abdus-Sabur v. Callahan*, No. 98-2242, 1999 WL 551133, at *1 (1st Cir. July 27, 1999). Section 1383(c)(3) explains that "[t]he final determination of the Commissioner . . . shall be subject to judicial review as provided in section 405(g)." Section 405(g) provides federal district courts with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." It also explains that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* Even if the federal district court would have reached a contrary conclusion as fact-finder, it must affirm the Commissioner's decision if it is supported by substantial evidence. *Rodriguez v. Pagan, Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

Conversely, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). When a court finds that an ALJ has erred, and the situation is one where "the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits." *Seavey*, 276 F.3d at 11. "Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome, then the court may order payment or affirm denial." *Id.* However, "if an essential factual issue has not been resolved, . . . and there is no clear entitlement to benefits, the court must remand for further proceedings." *Id.*

## III.    MEDICAL EVIDENCE

Mr. Bouvier suffers from a severe and disabling condition as a result of his service to our country in the Iraq War. Mr. Bouvier, age 47 at the time his application was filed, has a limited

education. Tr. at 7, 15, 42. He is a veteran of the Iraq War. *Id.* at 31. Since returning from war, Mr. Bouvier has a long-standing history of severe post-traumatic stress disorder (PTSD). *See, e.g., id.* at 13, 35, 36, 244-65, 297-303. Mr. Bouvier receives a disability pension from the VA on the basis of his PTSD. *See, e.g., id.* at 30, 188-89, 292-93, 2118. He also has a long history of alcohol dependence. *See, e.g., id.* at 7. In fact, Mr. Bouvier was fired from his last job because of his chronic alcohol abuse. *Id.* at 32, 35, 281. Mr. Bouvier also has severe depression, cirrhosis of the liver, and esophageal varices. *Id.* at 9. In his civilian life, he worked previously as a school custodian until September 14, 2007. *Id.* at 32, 35.

Mr. Bouvier had been treating with the Providence, Rhode Island Veteran's Affairs Medical Center (the VA) since at least September 2001. *Id.* at 244. In February 2008 he was diagnosed at the VA as suffering from "post-traumatic stress disorder, dysthymic disorder, major depressive disorder, . . . alcohol dependence and nicotine dependence." *Id.* at 288- 295. His Global Assessment of Functioning (GAF) score was 45. *Id.* at 295.

Mr. Bouvier was deemed to have service connected PTSD. *Id.* at 292-93. His symptoms were severe and disabling:

> Reexperiencing the traumatic events that have occurred in his life through recurrent and intrusive memories, thoughts, and nightmares, as well as feeling distressed when exposed to cues that resemble the traumatic event, such as watching the news. . . . he has also continued to experience avoidance of activities, situations, or people that remind the veteran of the event. . . . He has lost interest and has decreased his participation in activities such as the hobbies previously described. In addition, he has been feeling more detached and distant from others; . . . not enjoying socialization because, "I don't trust anybody." The veteran also reports having a sense of a foreshortened future and perceiving "health reasons" will limit his lifespan . . . . [T]he veteran has also experienced difficulties falling and staying asleep stating, "I use alcohol to avoid nightmares" with awakenings every two hours averaging six hours total sleep per night. The veteran has also expressed hypervigilance in that he checks his door locks every two hours and as a result cannot sleep through the night. An exaggerated startle response was also reported by the veteran (although not observed directly by

examiner) in which he indicated when he is at home he will jump if he hears a loud noise such as an alarm clock.

*Id.* at 293.

Mr. Bouvier's horrible war experiences came home with him and consumed his life. He conveyed "symptoms associated with panic attacks . . . triggered by thoughts of" the deaths of his three friends in Iraq, such as "increased heart rate, increased sweating, and increased agitation." *Id.* at 294. He also had "daily depressed mood that has lasted more than two years, as well as symptoms of insomnia, feelings of hopelessness, and decreased energy that are consistent with a dysthymic disorder." *Id.* He also had experienced suicidal ideation *Id.* Mr. Bouvier complained of decreased interest in activities, as well as "decreased concentration and attention" consistent with major depressive disorder of "moderately severity." *Id.* The examiner expressed the opinion that his "PTSD diagnosis is primary and that his dysthymic disorder and major depressive disorder, as well as alcohol and nicotine use are secondary and consequences of the PTSD." *Id.* at 295.

Mr. Bouvier presented at the VA Emergency Room with alcohol intoxication on November 3, 2008. *Id.* at 265-68. He was admitted to the VA Hospital and was discharged fifteen days later. *Id.* at 265. Upon discharge, he was referred to an inpatient alcohol abuse treatment program. *Id.* at 268, 400-27. He completed that program in October 2009. *Id.* at 1040.

Mr. Bouvier has abstained from alcohol since November 3, 2008 and has attended over 150 group counseling sessions at the VA to cope with his ongoing sobriety. (ECF No. 8 at 8 (citing Tr. at 244-399, 454-600, 741-855, 1614-2421, 2852-3027).) Mr. Bouvier also began regularly attending mental health counseling and PTSD Clinic group sessions in December 2008. *See, e.g.*, Tr. at 32, 2389. Since that time, he has attended over 80 PTSD Clinic group sessions

on topics such as anger management and trauma counseling.  (ECF No. 8 at 8 (citing Tr. at 244-399, 454-600, 741-855, 1614-1891, 1987-2421, 2852-3027)).)  In addition, he has had mental health counseling on a regular basis. *Id.* at 8.

On December 18, 2008, after several weeks in the treatment program, the VA records state that Mr. Bouvier has "ptsd from multiple past traumas during service," as well as "alcohol dependence" and "nicotine dependence." Tr. at 2391.  He continued to have "depressive and anxiety symptoms at times," and reported benefitting from psychiatric medication. *Id.* at 2389. The following symptoms of PTSD continued: "recurrent, intrusive, distressing memories"; "nightmares"; "flashbacks"; "significant distress from traumatic triggers"; "avoidance of environmental stimuli/triggers- avoids crowds"; "social isolation"; "feeling detached and estranged from others"; "irritability and outbursts of anger"; "hypervigilance"; and an "exaggerated startle response." *Id.* at 2389.

He was seen again in January 2009 and his GAF score was rated at 47. *Id.* at 376-79. He reported fluctuating mood, mind racing, "nightmares from Iraq War approx. 1x a week," "some 'paranoia'" and "dislike of crowds." *Id.* at 377.  He continued to experience the PTSD symptoms described above. *See, e.g.*, *id.* at 372.

Mr. Bouvier continued to receive mental health treatment for his many post-war symptoms and it was noted that he had "continued intermittent nightmares" and he questioned "acting out his dream." *Id.* at 323.  He was seen in May 2009 and his GAF score was rated as 45 at that time. *Id.* at 560-62.  In May 2009, he underwent a review examination for PTSD with psychologist Connie DiLeonardo, Ph.D., and was again diagnosed with "post-traumatic stress disorder" and "alcohol dependence in partial sustained remission." *Id.* at 504-12.  His GAF score was rated at 48-50, and he continued to report disturbed sleep, nightmares, poor

concentration, wandering "from task to task." *Id.* at 507, 509, 511. His mental status exam noted he had a "sad" affect and an "extremely severe depressed mood," and "severe symptoms of anxiety." *Id.* at 510. Dr. DiLeonardo found he continued "to meet criteria for the diagnosis of posttraumatic stress disorder related to military service." *Id.* at 510. She opined that Mr. Bouvier was severely disabled socially and occupationally:

> The veteran should be considered severely impaired in the social domain and extremely impaired in the occupational domain. . . . [T]he veteran should be considered unable to work at this time due to the debilitating psychiatric effects of his posttraumatic stress disorder. The major impact of his posttraumatic stress disorder is primarily social which has the effect of making it difficult if not impossible for him to be around other people. . . . As long as the veteran perceives that he is so impaired that he is unable to be around other people, it is not likely that he will be able to obtain and maintain gainful employment at this time. . . . [T]he veteran's posttraumatic stress disorder has a highly negative impact on his ability to work at this time and therefore, he should be considered unemployable at this time.

*Id.* at 512. She also noted his prior alcohol abuse was "more likely than not a result of the veteran's efforts to decrease the level of anxiety and stress generated by his posttraumatic stress disorder." *Id.*

Mr. Bouvier again presented to the VA Emergency Room in August 2009 due to an exacerbation of his PTSD symptoms. *Id.* at 2157-64. He reported "someone poked him in the ribs -- [he] became startled and started having flashbacks" and he "felt nervous, scared" and "kept thinking someone might come in window next to his bed." *Id.* at 2163-64. He was evaluated the next morning at Mental Health Emergency Services and was noted to have had "paranoia/hypervigilance." *Id.* at 2152-53. His mental status exam revealed an "anxious" mood, and a moderately anxious affect. *Id.* at 2154. His GAF score was rated at 47. *Id.* at 2155. His next two mental health visit notes showed stability on medication. *Id.* at 2138-41.

He was again seen by Mental Health Emergency Services on September 14, 2009 due to feeling "'panicky, nervous, closed in,'" and claustrophobic in the elevator and on the bus. *Id.* at

7

2126-27.  His GAF score was rated as 50.  *Id.* at 2129.  At an appointment three days later he reported "that he still tosses and turns at night with occasional nightmares," as well as occasional sleepwalking.  *Id.* at 2116-17.  He also reported "[c]rowds make him particularly anxious" and he expressed "distrust of others."  *Id.* at 2117.  He exhibited "recurrent, intrusive, distressing memories"; "nightmares"; "flashbacks"; "significant distress from traumatic triggers"; "avoidance of environmental stimuli/triggers"; "social isolation"; "feeling detached and estranged from others"; "irritability and outbursts of anger"; "hypervigilance"; and an "exaggerated startle response."  *Id.* at 2118.

Mr. Bouvier was seen again in October 2009 with "frequent wakenings, decreased appetite, decreased energy, and decreased interest/motivation."  *Id.* at 2096-97.  He reported an incident where he was found sleepwalking outside of his residential alcohol treatment facility. *Id.* at 2096.  He was seen again in December 2009 and continued to report the PTSD symptoms described above.  *Id.* at 2085-90.  He was seen in February 2010 and reported "ongoing frequent wakenings," "poor concentration," and PTSD symptoms.  *Id.* at 1863-64.  His mental status exam revealed "mildly constricted" affect and "flashbacks and nightmares as above."  *Id.* at 1866.  He was seen at least on a monthly basis from February through June, 2010, and reported some PTSD symptoms and nightmares.  *Id.* at 1800, 1934, 1947, 1958, 1976.

Dr. Sparsha Reddy took over his mental health treatment in July 2010.  *Id.* at 1765. During her first examination, Mr. Bouvier reported waking up every other hour, continued isolation, and continued PTSD symptoms.  *Id.*  He described "flashbacks 'maybe once a month,'" "recurrent, intrusive, distressing memories" twice a week; "nightmares" once a week, and he "avoids crowds" and he "continues to isolate."  *Id.* at 1765.  His mental status exam was normal except for "mildly constricted" affect, and his GAF score was rated at 60.  *Id.* at 1768.

Mr. Bouvier was seen again by Dr. Reddy in October 2010 requesting that his medications be refilled and he reported that "[t]hings are going smoothly." *Id.* at 1729-32.

He was seen again in November 2010 and reported waking "almost every hour of late, with military themed nightmares." *Id.* at 1704. He told of the following debilitating symptoms of PTSD: "recurrent, intrusive, distressing memories"; "nightmares"; "flashbacks"; "significant distress from traumatic triggers"; "avoidance of environmental stimuli/triggers"; "feeling detached and estranged from others"; and an "exaggerated startle response." *Id.* at 1705. His mental status exam revealed his affect as "dysthymic but brightens on interaction, mildly constricted." *Id.* at 1707. He was seen again in December and noted similar PTSD symptoms. *Id.* at 1667-69.

He continued treating with Dr. Reddy in March 2011 and noted problems with sleeping, as well as the above named PTSD symptoms. *Id.* at 2926-27. His mental status exam revealed "dysthymic" affect that "brightened on interaction." *Id.* at 2929. An April 2011 mental health note reveals stable symptoms. *Id.* at 2884.

In addition to Mr. Bouvier's medical records outlined above, the May 19, 2011 hearing record also includes records dated May 5, 2011 wherein Mr. Bouvier's treating physician Dr. Reddy opined that Mr. Bouvier is "markedly limited" in:

- "The ability to maintain attention and concentration for extended periods";
- "The ability to work in coordination with or proximity to others without being distracted by them";
- "The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent number and length of rest periods";
- "The ability to interact appropriately with the general public";
- "The ability to accept instructions and respond appropriately to criticism from supervisors"; and
- "The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes."

*Id.* at 3028-29.

Dr. Reddy also opined that Mr. Bouvier had "Moderately Severe" limitations in the ability to "[u]nderstand, carry out, and remember instructions"; "[r]espond appropriately to coworkers"; and "[r]espond to customary work pressures." *Id.* at 3031. She stated he would have "daily" "interruptions during an 8 hour workday" "given PTSD symptoms." *Id.* at 3032. Lastly, she wrote "I do not think he is able to tolerate working in an environment that requires freq[uent] social interactions & sustained mental effort as he has diff[iculty] concentrating, exaggerated startle response, avoidance of env[ironmental] stimuli/triggers (avoids crowds, never stands with his back to anyone, etc.)." *Id.* at 3030.

The evidence at the hearing also contains two state agency Mental Residual Functional Capacity (RFC) assessments dated June 26, 2009 and December 22, 2009. *Id.* at 450-53; 615-20. In the first RFC assessment, non-examining psychiatrist, Michael Slavit, Ph.D., found Mr. Bouvier has "no signif[icant] memory impair[ent]," "can sustain 2-hr/8-hr sched[ule] at routine tasks," "sustain at least superficial work rel[ationship]s," and "can make work decisions re objects and routine procedures." *Id.* at 452. In the second RFC assessment, however, even the Commissioner's own non-examining psychiatrist, Joseph Litchman, Ph.D., found Mr. Bouvier has "ch[]ronic PTSD and Major depression sequelae, even when abstinent [from] ETOH." *Id.* at 617. He found Mr. Bouvier "would not be able to appropriately handle supervisory oversight even in a simple 1+2 step routine." *Id.*

## IV.   ADMINISTRATIVE HEARING

At the May 19, 2011 hearing, Mr. Bouvier testified about his symptoms, stating that he is "afraid around people," does not trust people, and keeps to himself. *Id.* at 29. He explained that he needs a family member to accompany him if he has to go out. *Id.* He testified that he tries to

go out alone, but he cannot because he "get[s] pretty panicky," and he does not "like having people behind" him.  *Id.* at 31.  Mr. Bouvier reiterated that he does not "trust most people" because of his last combat time in Iraq.  *Id.*  He stated that he has no friends, and feels drowsy most of the day from his medications.  *Id.* at 32-33.  He normally takes a nap in the afternoon because he cannot stay awake.  *Id.* at 33.

Mr. Bouvier testified that he receives weekly treatment at the VA for his psychiatric issues.  *Id.* at 30.  He indicated that he regularly attends appointments at the VA, although they usually last for about an hour.  *Id.* at 33.  He explained that he can attend group sessions at the VA because he is with others who have the same problems he has.  *Id.* at 31.

Dr. Stuart Gitlow, a specialist in psychiatry and addiction medicine, testified at the hearing.  *Id.* at 35-41.  He opined Mr. Bouvier's mental status began to improve after he attained sobriety and by July 2009 "his mental status exam was largely intact with no significant difficulties."  *Id.* at 35-36.  Dr. Gitlow acknowledged Mr. Bouvier's chronic PTSD-related symptoms but opined that this impairment was "moderate in nature."  *Id.* at 36.

Dr. Gitlow also testified about his views on two other doctors' assessments and the VA's classification of Mr. Bouvier.  Dr. Gitlow deemed Dr. Litchman's assessment that Mr. Bouvier was "Markedly Limited" in social interaction "a little puzzling" since Mr. Bouvier had goals, such as becoming more proficient at the guitar and saving for a vehicle, that require "one-to-one instruction that would be comparable in nature to the type of supervision one might have in doing simple-step tasks."  *Id.* at 615-17, 38-39.  Dr. Gitlow was asked about a RFC assessment performed by Mr. Bouvier's treating psychiatrist, Dr. Reddy, that considered Mr. Bouvier "Markedly Limited" in several categories.  *Id.* at 39, 3028-32.  Dr. Gitlow disagreed with that

RFC assessment. *Id.* at 39.  Finally, Dr. Gitlow testified that he disagreed with the VA's finding that Mr. Bouvier has an ongoing disability. *Id.* at 39.

Vocational expert Michael Laraia was the last witness at the hearing. *Id.* at 41-44.  He testified that Mr. Bouvier "would have a moderate limitation in the ability to sustain social interactions, require an object-oriented task with only occasional work-related interactions with supervisors, coworkers, and the general public." *Id.* at 42.  In Mr. Laraia's opinion, Mr. Bouvier could not perform his past work as a school custodian. *Id.* at 32, 42.  Although Mr. Laraia stated that there were several jobs consistent with a hypothetical posed by the ALJ, if the following three sets of symptoms were present, he indicated that if Mr. Bouvier would not be able to work: (i) if he "had a moderately-severe limitation in concentration or the ability to respond to customary work pressures"; (ii) if he "had a moderately-severe limitation in social interactions that would be disruptive to the workplace for 15 minutes on a routine basis once a week"; or (iii) if he had a "marked restriction and ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticisms of supervisors." *Id.* at 43-44.

## V.   ALJ'S DECISION

The issue before the ALJ was whether Mr. Bouvier "is disabled under sections 216(i) and 223(d) of the Social Security Act." Tr. at 7.  In a decision dated June 8, 2011, the ALJ concluded that Mr. Bouvier "has not been under a disability within the meaning of the Social Security Act from November 2, 2008, through the date of this decision." *Id.* at 8.  She made several numbered findings supporting this conclusion. *Id.* at 9-15.

First, she found that Mr. Bouvier "meets the insured status requirement" of the Act through December 31, 2012. *Id.* at 9.  Second, she found that he "has not engaged in substantial

gainful activity since November 2, 2008." *Id.* Third, she found that he "has the following severe impairments:   depression, posttraumatic stress disorder, alcohol dependence in sustained remission and alcohol induced cirrhosis of the liver with esophageal varices (20 CFR 404.1520(c))." *Id.*   Within her fifth numbered finding, she stated that Mr. Bouvier has "a moderate limitation in the ability to sustain social interactions, requiring an object oriented task with only occasional work related interactions with supervisors, co-workers, and the general public." *Id.* at 11.   In her sixth finding, she determined that he "is unable to perform any past relevant work (20 CFR 404.1565)." *Id.* at 15.

The ALJ's fourth finding was that Mr. Bouvier "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." *Id.* at 10.   In her fifth finding, she specified that "he has the residual functional capacity to perform light work." *Id.* 11.   And in her tenth finding, she considered Mr. Bouvier's "age, education, work experience, and residual functional capacity," and stated that "there are jobs that exist in significant numbers in the national economy that [he] can perform." *Id.* at 9.

In reaching these latter conclusions, the ALJ rejected the opinion of Mr. Bouvier's treating psychiatrist, Sparsha Reddy, M.D., and instead relied on the Commissioner's medical expert, Dr. Stuart Gitlow.   *Id.* at 12-15.   The ALJ's stated reasoning for this was because "Dr. Gitlow had the advantage of reviewing the entire medical record . . . ." *Id.* at 14.   And further the ALJ rejected the contrary opinion of treating psychiatrist Dr. Reddy because the ALJ claimed that Dr. Reddy's opinion was "inconsistent with the record as a whole," namely Dr. Reddy's "progress notes that [Mr. Bouvier] was doing 'well' and had a GAF of 60." *Id.* at 14-15.   The ALJ also afforded "more weight to the state agency physicians' assessments that the

claimant is capable of unskilled, object oriented work." *Id.* at 14. Finally, the ALJ found that while Mr. Bouvier's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," she rejected Mr. Bouvier's descriptions of the "intensity, persistence and limiting effects of" his symptoms as "not credible." *Id.* at 14.

## VI.   R&R

The magistrate judge issued an R&R recommending that this Court deny Mr. Bouvier's Motion to Reverse the Commissioner and grant the Commissioner's Motion to Affirm the Decision of the Commissioner. (ECF No. 11 at 1-2, 21.) The magistrate judge focused on the ALJ's finding that Mr. Bouvier "was not disabled because he is capable of performing various unskilled light and sedentary jobs available in the economy." *Id.* at 17. The magistrate judge deemed this "a close case" and noted that "the record contains conflicting medical evidence." *Id.* at 18.

The magistrate judge noted that Mr. Bouvier argued "that the ALJ erred by giving less weight to the mental RFC assessment rendered by Dr. Reddy, a treating psychiatrist, and affording more weight to the opinions of Dr. Gitlow, the testifying medical expert, and Dr. Slavit, a consulting psychologist." *Id.* However, the magistrate judge concluded that Mr. Bouvier had "not shown any error in the ALJ's reasoning or flaw in the medical evidence relied upon which would warrant a reversal and remand." *Id.* at 20.

## VII.   OBJECTION TO THE R&R

After issuance of the R&R, Mr. Bouvier timely filed an objection.  (ECF No. 12).  The Commissioner did not file anything.  Mr. Bouvier asks this Court to reject the findings of the magistrate judge.[2]  *Id.* at 4.

Mr. Bouvier contends that the magistrate judge erred by finding that the ALJ properly weighed the evidence and provided reasons for rejecting the opinion of his treating physician, Dr. Reddy.  *Id.* at 1-2.  Specifically, Mr. Bouvier argues that the ALJ not only failed to comply with relevant regulations about treating sources, she failed to mention the criteria she was required to consider pursuant to 20 C.F.R. § 404.1527 and § 416.927.  *Id.* at 1-2.  It follows, then, that the R&R's finding that the ALJ's explanation why she did not give controlling weight to Dr. Reddy is erroneous.  *Id.* at 2.

Mr. Bouvier focuses on the ALJ's finding that Dr. Reddy's opinion was inconsistent with treatment notes indicating that Mr. Bouvier was "doing well" and had a GAF score of 60."  *Id.* A more thorough review of the record, according to Mr. Bouvier, reveals that Dr. Reddy's treatment notes are consistent with her opinions.  *Id.*  Mr. Bouvier points to record evidence supporting Dr. Reddy's opinions.  *Id.* at 2-3.  He deems erroneous the magistrate's agreement with the ALJ that Dr. Reddy's assessment was inconsistent.  *Id.* at 3.  Although Mr. Bouvier acknowledges that the ALJ recited reasons for her rejection of Dr. Reddy's opinion, he argues that the ALJ's rejection is not entitled to deference because her reasons are not supported by the record.  *Id.*  Finally, Mr. Bouvier discredits the ALJ's reasoning for affording more weight to Dr. Gitlow.  *Id.* at 4.  The ALJ's basis was that Dr. Gitlow "had the advantage of reviewing the

---

[2]  In his objection to the R&R, Mr. Bouvier incorporates the arguments presented in his Motion to Reverse the Decision of the Commissioner.  (ECF No. 12 at 1; ECF No. 8.)

entire medical record." *Id.* (quoting Tr. at 14).   According to Mr. Bouvier, Dr. Reddy had that

same advantage and therefore this reasoning is erroneous.[3]

## VIII.   ANALYSIS

"[T]he Social Security Act is to be construed liberally to effectuate its general purpose of

easing the insecurity of life." *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir. 1965) (citing

*Page v. Celebrezze*, 311 F.2d 757, 762 (5th Cir. 1963)).   "The broad purpose of the Act requires

a liberal construction in favor of disability and the intent of the Act is inclusion not exclusion."

*Black v. Sullivan*, 793 F. Supp. 45, 47 (D.R.I. 1992) (quoting *Rivera v. Schweiker*, 717 F.2d 719

(2nd Cir. 1983)); *see also Cohen v. Sec'y of Dept. of Health & Human Servs.*, 964 F.2d 524, 531

(6th Cir. 1992) ("[t]he Social Security Act is a remedial statute which must be liberally applied;

its intent is inclusion rather than exclusion") (internal quotation marks and citation omitted).

DIB is governed by Title II of the Act, as well as by different regulatory regimes.   *See* 42 U.S.C.

§ 401 et seq.; 20 C.F.R. § 404.1 et seq.   The Act provides that a claimant seeking DIB must

establish that he or she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A).

When evaluating a disability claim under the Act, the Commissioner employs a five-step

sequential evaluation process.   20 C.F.R. § 404.1520(a)(4).   This process requires the following

ordered determination:   (1) whether the claimant is currently engaging in "substantial gainful

activity"; (2) whether the claimant has a "a severe medically determinable physical or mental

impairment that meets the duration requirement . . . , or a combination of impairments that is

---

[3]   The magistrate judge noted the ALJ's rationale on this point, but did not comment on this
particular reason. (ECF No. 11 at 20.)

severe and meets the duration requirement"; (3) whether the impairment meets or equals a listing as set out in appendix 1 and "meets the duration requirement"; (4) whether, considering an assessment of the claimant's RFC, the impairment prevents the claimant from returning to "past relevant work"; and (5) whether, considering the claimant's RFC, age, education and work experience, the claimant is able to perform other work as it exists in the national economy. *Id.* Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" or combination of impairments "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(B); *see also* 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement.").

Relevant to this case, medical opinions from treating sources generally are given "more weight" "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). When "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," the regulations state that it is given "controlling weight." *Id.* The First Circuit has stated the same: "a treating source's opinion on the question of the severity of an impairment will be given controlling weight so long as it 'is well-supported

by medically acceptable clinical and laboratory diagnostics techniques and is not inconsistent with other substantial evidence in [the] record.'" *Polanco-Quinones v. Astrue*, 477 Fed.Appx. 745, 746 (1st Cir. 2012) (quoting 20 C.F.R. 404.1527(c)(2)).  In addition, section 404.1527(d)(2) also provides that an ALJ must give "good reasons" for the weight accorded to a treating source's opinion.   Conversely, if "a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply." *Shaw v. Sec'y of Health & Human Servs.*, No. 93-2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994).  "All things being equal, however, a treating doctor's report may be entitled to 'greater' weight than an inconsistent non-treating source." *Id.*

In addition, the Commissioner's regulations set forth a variety of factors to be utilized in evaluating the degree of weight of a treating provider's opinion.  20 C.F.R. §§ 404.1527(c), 416.927.  Those factors are:  (1) the "[l]ength of the treatment relationship and the frequency of examination," 20 C.F.R. § 404.1527(c)(2)(i); (2) the "[n]ature and extent of the treatment relationship," 20 C.F.R. § 404.1527(c)(2)(ii); (3) the supportability of the opinion, 20 C.F.R. § 404.1527(c)(3); (4) the consistency of the opinion "with the record as a whole," 20 C.F.R. § 404.1527(c)(4); (5) the specialization of the source, 20 C.F.R. § 404.1527(c)(5); and (6) "[o]ther factors."   20 C.F.R. § 404.1527(c)(6).   "Other factors" include "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record." *Id.*

Additionally, Social Security Ruling 96-2p(6) (the Ruling) provides that "[i]f a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted."  1996

WL 374188 (July 2, 1996). The Ruling's Policy Interpretation reminds adjudicators "that a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Id.* at *4. It explains that such "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." *Id.* And it notes that "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.*

In this case, Mr. Bouvier's treating psychiatrist, Dr. Reddy, opined that the impairments and limitation from Mr. Bouvier's chronic PTSD preclude him from sustaining competitive employment. Tr. at 3031-32. For example, she noted that he has moderately severe restrictions in relating to other people; understanding remembering and carrying out instructions; and responding to normal work pressures. *Id.* at 3031. Further, she opined that Mr. Bouvier is likely to be absent from work more than three times a month. *Id.* at 3032. In Dr. Reddy's opinion, Mr. Bouvier's condition has been this severe for several years and is expected to last for more than 12 months. *Id.* at 3032. Moreover, Mr. Bouvier's extensive records from the VA, dating back to his 2004 PTSD screening, provide voluminous additional support for Dr. Reddy's opinion. *Id.* at 1364-66; *see generally id.* at 244-399, 718-3027.

After a thorough review of the R&R, the ALJ's decision, and the entire record in this case, with appropriate deference to the ALJ's findings, this Court concludes that the ALJ did not properly weigh the evidence and provide reasons for rejecting the opinion of Mr. Bouvier's

treating physician, Dr. Reddy.[4]   This Court cannot affirm the ALJ's failure to follow the applicable regulations with respect to treating sources.   The ALJ failed to give Mr. Bouvier's treating physician "controlling weight" and failed to substantiate this decision, as the regulations require. There is not substantial evidence supporting the ALJ's findings regarding Mr. Bouvier's treating physician.   The ALJ further erred in finding the treating physician's opinions inconsistent with the record as a whole.

The ALJ did not follow the regulations' directives of affording the treating source's opinion controlling weight and did not find that the inconsistent evidence was substantial. *See* 20 C.F.R. § 404.1527(c)(2).   Dr. Reddy was clearly the source "most able to provide a detailed, longitudinal picture of [Mr. Bouvier's] medical impairment(s) and [who] bring[s] a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *Id.* As explained below, the ALJ: (1) ignored Dr. Reddy's treatment notes reflecting Mr. Bouvier's on-going PTSD; (2) improperly rejected Dr. Reddy's RFC assessment; (3) failed to acknowledge and give appropriate weight to Dr. Reddy's and the VA's lengthy treatment history of Mr. Bouvier; (4) was inconsistent in her treatment of GAF scores; (5) ignored the fact that Dr. Reddy had the entire record available to her from the VA just as did the Commissioner's witness Dr. Gitlow; and (6) inappropriately dismissed Dr. Reddy's opinion because she stated in her records that Mr. Bouvier was doing "well."

---

[4]   In the R&R, the magistrate judge in finding otherwise appears to have relied on several cases decided before a change in the regulations, published in the Federal Register in August of 1991, that pertains to treating sources. *See* 56 FR 36932; *see also Shaw*, 1994 WL 251000, at *3 (noting "the recently promulgated regulation relating to the weight to be assigned to treating doctor reports, 20 C.F.R. § 404.1527 (1991)").

First, the ALJ erred in discrediting Dr. Reddy's opinion by ignoring Dr. Reddy's mental health treatment notes reflecting Mr. Bouvier's ongoing complaints of PTSD symptoms. Upon her first examination of Mr. Bouvier, he reported waking up every other hour, continued isolation, and PTSD symptoms such as "flashbacks 'maybe once a month'"; "recurrent, intrusive, distressing memories" twice a week; one to two nightmares a week; "hypervigilance"; and avoiding crowds. *Id.* at 1765-66. A later examination revealed complaints of waking "almost every hour of late, with military themed nightmares." *Id.* at 1704. Mr. Bouvier again reported the following symptoms of PTSD: "recurrent, intrusive, distressing memories"; "nightmares"; "flashbacks"; "significant distress from traumatic triggers"; "avoidance of environmental stimuli/triggers"; "feeling detached and estranged from others"; and an "exaggerated startle response." *Id.* at 1705. Of note, he has reported the same PTSD symptoms since December 2008. *Id.* at 2389. Dr. Reddy's opinion is the opinion of a treating source, it is well-supported, and it is not inconsistent with substantial evidence in the record.

Second, the ALJ erred when she rejected Dr. Reddy's RFC assessment finding that Mr. Bouvier had "Moderately Severe" limitations in the ability to "[u]nderstand, carry out, and remember instructions"; "[r]espond appropriately to coworkers"; and "[r]espond to customary work pressures" due to PTSD symptoms because that assessment is consistent with substantial record evidence. *Id.* at 3031. As mentioned above, Mr. Bouvier has attended over 80 PTSD clinic sessions since December 2008, in addition to regular mental health treatment. (ECF No. 8 at 8 (citing Tr. at 244-399, 454-600, 741-855, 1614-1891, 1987-2421, 2852-3027).) Dr. Reddy explained that Mr. Bouvier would not be "able to tolerate working in an environment that requires freq[uent] social interactions & sustained mental effort as he has diff[iculty] concentrating, exaggerated startle response, avoidance of env[ironmental] stimuli/triggers

21

(avoids crowds, never stands with his back to anyone, etc.)." *Id.* at 3030. That opinion is consistent with her records showing ongoing complaints of distressing memories, nightmares, flashbacks, and exaggerated startle response. *See, e.g., id.* at 1704-10. Again, Dr. Reddy's opinion is well-supported and not inconsistent with substantial evidence in the record.

Next, the ALJ erred in discrediting the opinion of Dr. Reddy because she failed to give Dr. Reddy's opinion controlling weight in light of the length of Dr. Reddy's treatment relationship with Mr. Bouvier, the nature of their treatment relationship, and the supportability of the opinion.[5] Dr. Reddy had treated Mr. Bouvier regularly since July 2010, specifically for mental health treatment and treatment of his PTSD symptoms. *Id.* at 1765. In addition, Dr. Reddy had at her disposal the longitudinal record of Mr. Bouvier's treatment record at the VA. Mr. Bouvier had been treated at the VA since September 2001, and specifically for PTSD since at least 2005. *See, e.g., id.* at 1073-1076, 1566-74. Dr. Reddy knew of Mr. Bouvier's attendance at a PTSD residential program and encouraged him to continue attending PTSD groups. *Id.* at 1765, 69. The VA records also contain Mr. Bouvier's emergency visits for anxiety and his prior PTSD assessment by Dr. DiLeonardo finding Mr. Bouvier "severely impaired in the social domain and extremely impaired in the occupational domain." *Id.* at 512; *see, e.g., id.* at 2159-2164. Dr. Reddy's opinion is consistent with her own treatment records, as well as substantial evidence in the record showing Mr. Bouvier's ongoing marked impairments in occupational functioning due to his PTSD.

---

[5] The ALJ based her rejection of Dr. Reddy's opinion in part because her opinion that Mr. Bouvier was disabled was inconsistent with a progress note that stated Mr. Bouvier was doing "well." A complete reading of the record establishes that such a conclusion is unfounded. The notation that Mr. Bouvier was doing "well" during one of his many visits to the VA in no way undermines her opinion that he was disabled. Even disabled people have days when they are doing well.

Fourth, the ALJ also discredited Dr. Reddy's opinion that Mr. Bouvier was disabled because Dr. Reddy rated Mr. Bouvier's GAF score at 60. *Id.* at 14-15. This assertion by the ALJ is dubious because in her own opinion, the ALJ discredited Mr. Bouvier's GAF scores of 45-50 reflected in various VA records, stating "[t]he score can be based on behaviors which have little or no relationship to occupational functioning." *Id.* at 12-13, n.1. Thus, the ALJ chose to discredit Mr. Bouvier's low GAF scores reflecting severe symptoms but adopted a GAF score showing moderate symptoms. This selective reading of the record is an erroneous basis for discrediting Dr. Reddy's opinion.

Fifth, the ALJ erred in affording more weight to the opinion of Dr. Gitlow because he "had the advantage of reviewing the entire medical record." *Id.* at 14. As mentioned above, the vast majority of Mr. Bouvier's rather lengthy treatment record is from evaluations and services at the VA.[6] Dr. Reddy also had the advantage of reviewing Dr. Bouvier's medical records, including his numerous PTSD clinic visits, his emergency room visits for anxiety, and his prior mental health and PTSD assessments. Thus, it was illogical for the ALJ to give Dr. Gitlow's opinion more weight when Dr. Reddy also had the benefit of reviewing his records.[7]

Finally, the ALJ inappropriately dismissed Dr. Reddy's opinion because Dr. Reddy stated in a record that Mr. Bouvier was doing "well." *Id.* at 14. One comment in the record is not "substantial evidence." *See* 20 C.F.R. § 404.1527(c)(2). A reading of the entire record establishes that the ALJ's reliance on this one comment is an insufficient basis for disregarding a

---

[6] The record contains over twenty medical exhibits relating to the period after the amended onset date; only one is from a treating source outside of the VA, the Tri-Hab residential treatment facility, a program to which he was referred by the VA. *Id.* at 400-27.

[7] The ALJ also credited Dr. Gitlow because he had the opportunity to view Mr. Bouvier at the hearing. *Id.* at 14. This limited opportunity pales in comparison to Dr. Reddy's treatment relationship with Mr. Bouvier. Observation of questioning at a hearing is not a credible reason to afford more weight to Dr. Gitlow's opinion than the opinion of a treating source.

treating physician's opinion.  The notation that Mr. Bouvier was doing "well" during one of his many visits to the VA in no way undermines Dr. Reddy's opinions regarding Mr. Bouvier.

Therefore, the R&R is rejected because it affirmed the ALJ's erroneous evaluation the opinions of Mr. Bouvier's treating physician.  The ALJ's findings of fact "are not conclusive when derived by ignoring evidence [or] misapplying the law." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ did not follow the applicable regulations, and there is not substantial evidence in the record to support the ALJ's preference for Dr. Gitlow's opinion over the opinion of treating physician Dr. Reddy.

## IX.    CONCLUSION

For the reasons stated above, this Court rejects the R&R of the Magistrate Judge (ECF No. 11), GRANTS Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 8) and DENIES the Commissioner's Motion for an order Affirming the Decision of the Commissioner.  (ECF No. 10.)

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Judge
February 14, 2013